## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JUDY L. BAKER, | ) | |
| | ) | CASE NO. 1:15-cv-00910 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 15).

The issue before the undersigned is whether the final decision of the Acting Commissioner of

Social Security ("Commissioner") denying Plaintiff Judy L. Baker's ("Plaintiff" or "Baker")

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. § 1381 *et seq*., is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS Commissioner's decision.

### I.  Procedural History

Plaintiff filed an application for SSI in February of 2012.  (Tr. 169-178).  Plaintiff alleged

she became disabled on October 1, 2008.  (Tr. 169).  The Social Security Administration denied

Plaintiff's application on initial review and upon reconsideration.  (Tr. 64-96).

At Plaintiff's request, an administrative law judge ("ALJ") convened an administrative

hearing on October 1, 2013 to evaluate her application.  (Tr. 13-24).  Plaintiff, represented by

counsel, appeared and testified before the ALJ.  (*Id*).  A vocational expert ("VE") also testified.

(*Id*).

On November 22, 2013, the ALJ issued an unfavorable decision, finding Plaintiff was not

disabled.  (Tr. 13-24).  After applying the five step sequential analysis,[1] the ALJ determined

Plaintiff retained the ability to perform work existing in significant numbers in the national

economy, and that she was not under disability at any time since the date the application was

filed.  (*Id*).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals

Council.  (Tr. 9).  The Appeals Council denied the request for review, making the ALJ's

determination the final decision of the Commissioner.  (Tr. 1-4).  Plaintiff now seeks judicial

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step
sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a),
416.920(a); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth
Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful
> activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(I).  Second, the
> claimant must show that he suffers from a severe medically determinable physical or
> mental impairment.  *Id*. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his
> impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt.
> 404, Subpt. P, App. 1, he is deemed disabled.  *Id*. § 404.1520(a)(4)(iii).  Fourth, the
> ALJ determines whether, based on the claimant's residual functional capacity, the
> claimant can perform his past relevant work, in which case the claimant is not
> disabled.  *Id*. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the
> claimant's residual functional capacity, as well as his age, education, and work
> experience, the claimant can make an adjustment to other work, in which case the
> claimant is not disabled.  *Id*. § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden
> shifts to the Commissioner at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d
> 525, 529 (6th Cir. 1997).

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).

review of the Commissioner's decision pursuant to 42 U.S.C. § 1383(c)(3).

## II.  Evidence

### A.  Personal and Vocational Evidence

Plaintiff was born in April of 1960 and was 51 years old on the date the application was filed, making her an individual "closely approaching advanced age" for Social Security purposes. (Tr. 23); 20 C.F.R. § 416.963(d).  Plaintiff has no past relevant work.  (Tr. 23).  Plaintiff has a limited education.  (Tr. 23).

### B.  Medical Evidence[2]

#### 1.  Physical Impairments

In June of 2011, Plaintiff complained of chest pain and pressure.  (Tr. 417, 539).  She stated that immediately after taking a new medication, she experienced chest tightness, dizziness sweating, and lightheadedness.  (Tr. 417).  A chest x-ray performed the same month revealed that Plaintiff's heart, mediastinum and pulmonary vessels were all within normal limits; and there was no sign of acute cardiopulmonary disease.  (Tr. 555).  In the same month, medical records indicate Plaintiff was 5'5" tall and weighed 211 pounds.  (Tr. 375).

On February 7, 2012, Plaintiff was seen by John Bell, M.D.  (Tr. 585-88).  Plaintiff complained of fatigue, stating that she slept most of the day.  (Tr. 585).  Dr. Bell performed two physical examinations of Plaintiff in 2012, both of which were unremarkable and included normal range of motion, normal muscle strength, and stability in all extremities with no pain on

---

[2] Despite the Court's Initial Order requiring the parties to set forth the facts without "argument, coloring, or 'spin,'" Plaintiff's "Statement of Facts" at times fails to comply with the Court's order.  (Doc. 5).  The Court's recitation of the evidence is not intended to be exhaustive and primarily incorporates those portions of the record cited in the parties' briefs.

inspection.  (Tr. 586-87, 594-95).  On February 24, Plaintiff was seen by cardiologist Razak U. Kherani, M.D.  (Tr. 309-313).  Physical examination was mostly unremarkable, except for possible thyroid enlargement and a fast heart rate.  (*Id*).  She had a normal gait and extremities were normal.  (Tr. 313).  Plaintiff weighed 197 pounds at this visit, with a Body Mass Index (BMI) of 32.82.[3]  (Tr. 312).

In March of 2012, Dr. Kherani noted that Plaintiff underwent an echocardiogram, the results of which were "essentially normal."  (Tr. 302.)  The same month, Plaintiff had an abnormal exercise myoview cardiac perfusion stress test.  (Tr. 475).  A treadmill stress test was terminated due to labored breathing.  (Tr. 476).  At that time, Plaintiff advised that her chest pain had subsided.  (Tr. 299).

On April 12, 2012, Plaintiff was seen by cardiologist Michael Langer, D.O.  (Tr. 428-431).  She complained of chest tightness, shortness of breath on exertion, lightheadedness, and near syncope.  (Tr. 428-31). Physical examination performed at that time was generally unremarkable, including findings of normal gait.  (Tr. 430).  Dr. Langer's assessment included angina, CCS clas III, abnormal stress test, diabetes mellitus, hypertension, unknown lipid profile, sinus tachycardia, obesity, history of liver cirrhosis, and osteoarthritis.  (Tr. 434).  The same month, the results of a cardiac catheterization report were mostly normal, though Plaintiff's left ventricular ejection fraction was 60 percent.  (Tr. 424).  Ryan Christofferson, M.D., the cardiologist who performed the catheterization, wrote a handwritten note stating:

---

[3]  As set forth in Social Security Ruling 02-01p, 2002 SSR LEXIS 1 (SSR 2002), the National Institutes of Health's (NIH) Clinical Guidelines recognize three levels of obesity.  Plaintiff's BMI of 32.82 places her in the lowest level of the three categories (Level I = 30.0-34.9).

> Autonomic dysfunction
> Avoid standing long time
> Drink lots of water
> Stand up slowly, start slowly
> Can have salt in diet
> Get good sleep
> Avoid stress

(Tr. 747).

On May 1, 2012, an MRI of Plaintiff's right sternoclavicular joint was normal.  (Tr. 662).

On May 15, 2012, Plaintiff was again seen by Dr. Bell, who diagnosed Plaintiff with

hypertension, improved; diabetes mellitus Type II, uncomplicated, chronic; depression, recurrent;

and autonomic dysfunction, symptomatic.  (Tr. 601-605).  A physical examination was

unremarkable.  (Tr. 603-604).

On June 4, 2012, Plaintiff reported to Dr. Langer that she had no recurrent chest tightness,

but continued to experience dyspnea ascending one flight of stairs, dizziness, and near syncope.

(Tr. 724).  Dr. Langer noted Dr. Christofferson's above recommendation for treatment of

autonomic dysfunction with which he agreed.  (*Id*).  Dr. Langer recommended that Plaintiff

"attempt to engage in a walking program."  (*Id*).

On October 25, 2012, x-rays of Plaintiff's left knee and cervical spine showed mild

degenerative changes but were otherwise unremarkable.  (Tr. 649).

On November 15, 2012, Plaintiff complained of chronic pain in her right shoulder.  (Tr.

706).  On November 20, 2012, right shoulder x-rays also revealed no acute findings and showed

only mild degenerative changes.  (Tr. 742).  On November 21, 2012, Plaintiff reported that he

headaches had improved after discontinuing Xanax.  (Tr. 697-98).  Dr. Bell noted that Plaintiff's

headaches could also be due to neck spasms, though Plaintiff declined treatment at that time.

5

(Tr. 697).

On December 3, 2012, Plaintiff told Dr. Langer she was experiencing occasional episodes of mild chest tightness with occasional palpitations and dizziness. (Tr. 718). She denied experiencing shortness of breath while resting, but had experienced dyspnea on exertion recently. (*Id*). Dr. Langer found Plaintiff appeared to be stable from a cardiac standpoint and recommended slow positional changes, at least thirty minutes of aerobic exercise per day, staying hydrated, and weight loss. (*Id*). Dr. Langer determined that no further cardiac testing was necessary, and that Plaintiff should follow up on an as-needed basis. (*Id*).

On January 30, 2013, Plaintiff presented to neurologist Domingo Gonzalez, M.D., complaining of cervical and shoulder pain. (Tr. 733). His examination of Plaintiff's cervical spine revealed limitation of motion in all directions. (*Id*). He further observed limited movement of the shoulders and pain at the shoulder level, and positive Tinel's signs of both wrists. (Tr. 733-34). Dr. Gonzalez's impression included cervical radiculopathy in both upper extremities and possible bilateral carpal tunnel syndrome. (Tr. 734). Otherwise, Dr. Gonzalez noted Plaintiff had a normal gait, station, and coordination. (*Id*).

Upon referral from Dr. Gonzalez, Plaintiff underwent a physical therapy evaluation on February 1, 2013. (Tr. 744). Though Plaintiff demonstrated global weakness throughout every upper extremity muscle group tested, evaluating therapist Kevin Dusenbury observed self-limiting behavior by Plaintiff, "somewhat poor effort," and positive Waddell's signs. (*Id*). He further indicated that it was difficult to differentiate between actual pain generators and amplified responses due to Plaintiff's poor testing effort. (*Id*).

On February 11, 2013, nerve conduction studies "of the upper extremities that were tested

6

were normal" with the exception with a mild sensory delay bilaterally and slight reduction in the right median motor amplitude.  (Tr. 644).  On March 1, 2013, Dr. Gonzalez noted that the studies showed no evidence of cervical radiculopathy, but did suggest bilateral carpal tunnel syndrome.  (Tr. 732).  Dr. Gonzalez recommended hand splints be worn during the night to see if right arm and shoulder pain symptoms improve.  (Tr. 732).

On March 26, 2013, an MRI of Plaintiff's cervical spine revealed no fracture or subluxation with some mild disk bulging and mild narrowing of the central canal.  (Tr. 665-66).

On April 3, 2013, Dr. Gonzalez noted that an MRI of the cervical spine revealed some degenerative changes of the cervical spine, but said changes did not warrant "doing anything aggressive" given that Plaintiff did not have a significant amount of pain or limitation in the cervical spine.  (Tr. 731).  He recommended carpal tunnel decompression.  (*Id*).  Plaintiff stated that she wanted to postpone making a decision concerning surgery.  (*Id*).

On April 30, 2013, Plaintiff was seen by Brian Loft, M.D., and told him she would lose her insurance the following month.  (Tr. 672).  She told Dr. Loft that her cardiologist advised that "as long as she doesn't pass out, nothing else needs to be done" with regard to her autonomic dysfunction.  (Tr. 673).

On June 13, 2013, Plaintiff again complained of headaches.  (Tr. 667).

On December 19, 2013, after the ALJ issued his decision, Dr. Langer wrote a letter to Plaintiff's counsel indicating that Plaintiff was under his care for autonomic dysfunction, a chronic condition that has been treated with conservative measures.  (Tr. 275).  He noted that Plaintiff had to keep well hydrated, stand up slowly and start slowly, and to avoid stress and get a good night's sleep.  (*Id*).

7

### 2.  Mental Impairments

On January 23, 2012, at her initial visit with Dr. Bell, Plaintiff complained of depressive and anxiety symptoms that first started the previous month in December 2011.  (Tr. 577.)  Dr. Bell diagnosed depression.  (Tr. 579).  He did not recommend any treatment for Plaintiff's mental health complaints.  (*Id*).  On January 30, 2012, one week later, Plaintiff stated that her prior week was "very stressed," but the record contains no additional mental-health related complaints or symptoms.  (Tr. 581-83).  In his assessment, Dr. Bell characterized Plaintiff's depression as "asymptomatic."  (Tr. 583).  Plaintiff mentioned no other mental health complaints to Dr. Bell during visits through May of 2012.  (Tr. 585-605).

Primary care visits during the period from October 2012 to June 2013 consistently reflected no mental health issues.  (Tr. 672, 675, 681, 690, 696, 700, 705, 709, 714).

### 3.  State Agency and Consultative Examinations

On May 9, 2012, Plaintiff underwent a consultative psychological evaluation performed by Thomas Evans, Ph.D. , for evaluation of the presence or absence of a mental disorder and an assessment as to any resulting mental limitations as it relates to her ability to work.  (Tr. 529-34).  Plaintiff reported that she completed the 9th grade and never obtained a GED.  (Tr. 530).  Dr. Evans noted that Plaintiff drove herself to the appointment, arrived an hour early, and was cooperative and friendly throughout the entire evaluation.  (Tr. 529).  Plaintiff also reported that she had never been psychiatrically hospitalized, had never been under the care of a psychiatrist, and never received mental health counseling.  (Tr. 531).  She denied any current depression.  (*Id*).  Plaintiff stated that she had a checking and savings account and handled the family's finances (*Id*).  Dr. Evans observed that Plaintiff fully answered all questions, had normal speech which

8

was understandable at all times, and observed no noted features of anxiety.  (*Id*).  Plaintiff

demonstrated adequate insight into her problems and adequate social judgment.  (Tr. 531-32).

Intelligence testing yielded a full scale IQ score of 52, which placed Plaintiff at the 0.1

percentile.[4]  (Tr. 532).  Despite the extremely low score, Dr. Evans advised that a diagnosis of

mild mental retardation was not warranted, as Plaintiff's "adaptive functioning is much better

than her cognitive abilities."  (Tr. 533).  Functionally, Dr. Evans assessed that Plaintiff would

have significant difficulty carrying out complex to moderately complex instructions, as well as

significant difficulty following multistep tasks in a work setting.  (*Id*).  However, Dr. Evans

noted that Plaintiff displayed good attention and concentration throughout the entire evaluation,

and that she was able to maintain focus without any difficulty.  (*Id*).  Dr. Evans assessed no

restrictions with respect to Plaintiff's ability to interact with others, and no difficulty responding

appropriately to work pressures.  (Tr. 534).  Dr. Evans concluded that Plaintiff exhibited "no

mental health symptoms that would preclude gainful employment...."  (*Id*).

On June 1, 2012, non-examining State Agency reviewing psychologist Bruce Goldsmith,

Ph.D., concluded that Plaintiff was moderately limited in her ability to perform activities of daily

living, mildly limited in her ability to maintain social functioning, and moderately limited in her

ability to maintain concentration, persistence, or pace.  (Tr. 72).  Dr. Goldsmith opined that

Plaintiff could perform a simple, routine job in a low-stress environment with infrequent

changes.  (Tr. 77).  On December 4, 2012, non-examining State Agency reviewing psychologist

Jeffrey Swain, Psy.D., made findings generally consistent with the above opinion, also noting

---

[4]  According to an unidentified and difficult to decipher record that appears to stem from Plaintiff's school records, she had a verbal IQ score of 77, a non-verbal IQ score of 75, and a composite IQ score of 76.  (Tr. 272).

that Plaintiff had no limitation in her ability to engage in social interaction.  (Tr. 92).  In addition to Dr. Goldsmith's functional restrictions, Dr. Swain also found that Plaintiff required a work environment that did not require strict or fast production pressures.  (*Id*).

On July 28, 2012, Mushtaq Mahmood, M.D., performed a physical consultative examination.[5]  (Tr. 618-27).  She reported her pain level as 8 out of 10 on most days, including the day of the examination.  (Tr. 618).  Dr. Mahmood documented Plaintiff's weight as 184 pounds.  (Tr. 620).  Plaintiff's sensory examination was normal.  (Tr. 621.)  Plaintiff was unable to perform heel and toe or tandem walking, and had difficulty getting up and down from the exam table.  (Tr. 621).  Plaintiff had a symmetric, steady gait; had no joint swelling, erythema, effusion, tenderness or deformity; was able to lift, carry, and handle light objects; and was able to rise from a sitting position without assistance.  (Tr. 621-22).  Muscle testing of the upper and lower extremities yielded all "good" results, range of motion was within normal limits, and Plaintiff's ability to grasp, manipulate, pinch, and perform fine coordination were all normal bilaterally.  (Tr. 624-26).  Functionally, Dr. Mahmood opined that Plaintiff had mild limitations with respect to sitting, standing, and walking due to low back pain, and she did not require the use of an assistive device.  (Tr. 622).  Dr. Mahmood further opined that Plaintiff could occasionally bend, stoop, crouch, and squat, and that the Plaintiff had no manipulative limitations with regards to reaching, handling, feeling, grasping, or fingering, which she could perform frequently.  (*Id*).

On August 13, 2012, non-examining State Agency reviewing medical consultant Uma

---

[5]  Though Dr. Mahmood's examination focused generally on Plaintiff's physical limitations, he did note that Plaintiff had fluent speech, appropriate mood, clear thought process, normal memory, and good concentration.  (Tr. 621).

Gupta, M.D., opined that Plaintiff, in an eight-hour workday, could do the following: lift twenty pounds occasionally and ten pounds frequently; stand/walk for about six hours; sit for about six hours; frequently kneel, crouch, crawl, and climb ramps/stairs; and, occasionally stoop and climb ladders/ropes/scaffolds.  (Tr. 74-75).  With respect to environmental limitations, Plaintiff's only limitations was the need to avoid concentrated exposure to hazards.  (*Id*).  On December 5, 2012, non-examining State Agency reviewing consultant Robert Klinger, M.D., affirmed Dr. Gupta's earlier assessment.  (Tr. 89-91).

**C.  Hearing Testimony**

At the October 1, 2013 hearing, Plaintiff testified as follows:

- She is 5'5" tall and weighed 187 pounds at her last doctor's appointment.  (Tr. 40).

- She is able to drive and does so almost daily, as she drives her grandson to college which is approximately forty minutes round-trip.  (Tr. 41).

- She cannot work because she has problems standing or sitting for "a length of time."  She needs to keep moving around to ease her back pain.  She also referenced pain in her neck.  (Tr. 41).  She cannot push, pull or lift "a whole lot." (Tr. 42).

- She did not undergo surgery for carpal tunnel syndrome because she did not want "them cutting on my hands" and because she feared being allergic to anesthesia. (Tr. 42).

- She can read "a little, not a lot."  (Tr. 42).  Her step-mother filled out her social security paperwork on her behalf.  Her husband also helps her with reading.  (Tr. 43).

- She pays the family's bills over the internet, which the bank set up for her so she only needs to enter the amounts.  (Tr. 44).

- She cannot sleep through the night due to pain and takes one-hour naps daily.  (Tr. 45).

- She believed she became disabled in 2008 when she began having problems with

11

her blood pressure.  (Tr. 46).

• She was diagnosed with autonomic dysfunction by Dr. Christofferson.  Her symptoms include high blood-pressure and lightheadedness.  (Tr 47).

• She has trouble remembering things and has to keep a calendar for appointments and a special container for her medications with compartments for the days of the week.  (Tr.47- 48).

• Her husband performs all the house-cleaning and helps her prepare meals.  Her grandson also helps her lift items.  She also requires help grocery shopping due to her difficulty lifting things.  (Tr. 48-49).  The heaviest item she can lift is a gallon of milk, but she needs to use both hands.  (Tr. 50).

• She experiences numbness in her hands that she attributes to her carpal tunnel syndrome.  (Tr 50.)

• She can stand for 20 minutes before needing to sit due to pain.  (Tr. 52).  She has difficulty walking due to swelling in her knees.  (Tr. 53).

• She attended physical therapy bi-weekly for a few weeks but stopped going because it was not helping.  (Tr. 54-55).

• She takes over-the-counter medications for her pain.  (Tr. 54).

The ALJ posed the following hypothetical question to the VE:

Completed the ninth grade.  For the first hypothetical I'd like you to assume that the person could lift and carry, push or pull 20 pounds occasionally, 10 pounds frequently; could stand or walk for six out of eight hours, or sit -- and sit for six out of eight hours; could frequently use ramps and stairs, occasionally use ladders, ropes or scaffolds; could occasionally stoop; can frequently kneel, crouch, or crawl.  That person must avoid concentrated exposure to unprotected heights and fast-moving machinery.

That person can perform simple, routine job tasks with infrequent changes, and that do not require strict or fast-paced production quotas.  And that person -- and I guess what I'm going to ask you is that -- I mean, that's my limitations for now.  There is -- if someone was going to say they required a low-stress environment, what would that mean to you?

* * *

12

What I'd like to do to add to that first hypothetical is just add the person is limited to superficial interaction with others, which I think is kind of inherent in simple, routine work, but I just wanted to clarify that.  Would that person be able to do any jobs in the local or in the national economy?  If so can you give me several demonstrative examples?

(Tr. 60).

The VE testified that such an individual could perform jobs at the light exertional level and gave the following examples: housekeeping cleaner, Dictionary of Occupational Titles ("DOT") § 323.687-014 (2,000 jobs regionally, 30,000 in Ohio, and 500,000 nationally); mail clerk, DOT § 209.687-026 (600 jobs locally, 7,000 in Ohio, and 150,000 nationally); and fast-food worker, DOT § 311.472-010 (5,000 jobs regionally, 60,000 in Ohio, and 2,000,000 nationally).  (Tr. 59, 61.)  When asked whether an individual with a sit/stand option could perform the identified jobs, the VE responded in the negative.  (Tr. 61.)  Plaintiff's counsel had no questions for the VE.  (Tr. 62).

### III.  Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law in his November 22, 2013 decision:

1.  The claimant has not engaged in substantial gainful activity since February 13, 2012, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: diabetes mellitus, degenerative disc disease, osteoarthritis, organic mental disorder/cognitive disorder, depression, liver cirrhosis, hypertension, sinus tachycardia, obesity, and autonomic/possible vasodepressor syndrome (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

13

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), limited to lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; with the ability to stand and/or walk 6 hours in an 8 hour work day; with the ability to sit about 6 hours in an 8 hour work day; with the ability to frequently climb ramps and stairs; with the ability to occasionally climb ladders, ropes, and scaffolds; with the ability to occasionally stoop; with the ability to frequently kneel; with the ability to frequently crouch; with the ability to frequently crawl; precluded from concentrated exposure to unprotected heights and fast moving machinery; limited to simple, routine work with infrequent changes which does not require strict/fast production quotas; and limited to superficial interaction with others.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on April **, 1960 and was 51years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since February 13, 2012, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15-24).

## IV.  Disability Standard

A claimant is entitled to receive a Period of Disability, Disability Insurance Benefits or

Supplemental Security Income benefits only when she establishes disability within the meaning

14

of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 20 C.F.R. §§ 404.1505, 416.905(a).

## V.  Standard of Review

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kennedy v. Astrue*, 247 Fed. App'x 761, 2007 WL 2669153, at *3 (6th Cir. 2007); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed. (*Id.*)

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  *See Kennedy*, 247 Fed. App'x 761, 2007 WL 2669153, at *3; *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner v. Heckler*, 745 F.2d

15

383, 387 (6ᵗʰ Cir. 1984).  However, the court may examine all the evidence in the record in

making its decision, regardless of whether such evidence was cited in the Commissioner's final

decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6ᵗʰ Cir. 1989).

## VI.  Analysis

### A.  Credibility

Plaintiff's first assignment of error contends that the credibility determination contained

in the decision was deficient under 20 C.F.R. § 416.929 and Social Security Ruling ("SSR") 96-

7p.  (Doc. 12 at pp. 12-17).  Specifically, Plaintiff argues the ALJ failed to consider the requisite

factors outlined in 20 C.F.R. § 416.929(c)(4).  (*Id*. at 13).

It is the ALJ's responsibility to make decisions regarding the credibility of witnesses, and

the ALJ's credibility determinations are entitled to considerable deference.  *See Vance v. Comm'r*

*of Soc. Sec.*, 260 Fed. App'x 801, 806 (6ᵗʰ  Cir. 2008) (*citing Walters v. Comm'r of Soc. Sec.*, 127

F.3d 525, 531 (6ᵗʰ Cir. 1997)).  In evaluating a claimant's subjective complaints of pain, this

Circuit has established a two part test.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 243, 243 (6ᵗʰ

Cir. 2007).  The ALJ must consider (1) whether the objective medical evidence supports a

finding of an underlying medical condition, and (2) whether the objectively established medical

condition is of a level of severity that it can reasonably be expected to produce the claimant's

alleged symptoms.  *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6ᵗʰ Cir.

1986); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6ᵗʰ Cir. 1994).  The ALJ should consider the

following factors in evaluating the claimant's symptoms: (1) the claimant's daily activities; (2)

the location, duration, frequency, and intensity of the claimant's symptoms; (3) any precipitating

or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication

16

taken to alleviate the symptoms; (5) treatment, other than medication, the claimant received to relieve the pain; (6) measures used by the claimant to relieve symptoms; and (7) other factors concerning your functional limitations.  *Rogers*, 486 F.3d at 247; *see Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 SSR LEXIS 4, 1996 WL 374186 (July 2, 1996); 20 C.F.R. § 929(c)(3).  "While in theory [a court] will not 'disturb' an ALJ's credibility determination without a 'compelling reason,' *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), in practice ALJ credibility findings have become essentially 'unchallengeable.'"  *Hernandez v. Comm'r of Soc. Sec.*, 2016 U.S. App. LEXIS 5040 (6th Cir. Mar. 17, 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 113 (6th Cir. 2010)).

Plaintiff's credibility argument primarily asserts that the ALJ "failed to properly evaluate [carpal tunnel syndrome] and the impact that disease had on her use of her upper extremities ..." (Doc. 12 at p. 15) and that the ALJ performed a "faulty" evaluation of her autonomic dysfunction because he did not "correctly evaluate that impairment."  (Doc. 12 at p. 16).  It is questionable whether these arguments truly raise a challenge to the ALJ's evaluation of her credibility.  To the extent Plaintiff is arguing that the ALJ should have found her credible because she suffers from these impairments, such an argument is an invitation for this Court to conduct its own *de novo* credibility assessment.  The Court declines to do so, because a social security appeal does not allow a court to review the evidence *de novo*, to make credibility determinations, or to reweigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Plaintiff emphasizes that she was diagnosed with carpal tunnel syndrome as a result of the positive Tinel's signs on examination.  (Doc. 12 at p. 16).  However, a diagnosis alone does not indicate the functional limitations caused by the condition.  *See, e.g., Young v. Sec'y of Health &*

*Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) (diagnosis of impairment does not indicate severity of impairment); *Bradley v. Sec'y of Health and Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988) (signs of arthritis not enough; must show that condition is disabling).  Similarly, Plaintiff argues that her autonomic dysfunction could produce the symptoms of lightheadedness and dizziness of which she often complained.  (Doc. 12 at p. 16).  However, merely because an impairment is capable of causing a claimant's symptoms does not require the ALJ to accept a claimant's allegation as to the severity of her symptoms.  To the extent Plaintiff is arguing that treatment for autonomic dysfunction, which included avoiding standing for a long time, is incompatible with the RFC determination, such an argument is more appropriately addressed in her second assignment of error than her first and is, therefore, addressed below.

        Plaintiff also asserts that the ALJ failed to evaluate her symptoms and credibility under the seven factors set forth in the regulations.  First, the regulations do not mandate a discussion of every single credibility factor, as an ALJ may satisfy his or her obligations by considering those factors considered relevant.  *See Bowman v. Chater*, 132 F.3d 32 (Table) [published in full-text format at 1997 U.S. App. LEXIS 34130], 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (*per curiam*).  Furthermore, Plaintiff does not identify any authority — and the Court is unaware of any authority – that would require the ALJ to list each factor in his opinion or to discuss each of those factors in detail.  Other decisions have explicitly stated that "[a]n ALJ need not analyze all seven factors, but should show that she considered the relevant evidence."  *See , e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.); *Wolfe v. Colvin*, 2016 U.S. Dist. LEXIS 62360 at *30 (N.D. Ohio 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, 2012 U.S. Dist. LEXIS 47590 at *29 (N.D. Ohio Apr. 4, 2012) (White,

M.J.).

Here, the ALJ acknowledged he must follow a two-step process to determine whether Plaintiff's pain was credible.  (Tr. 18-19).  Furthermore, reading the record as a whole, the ALJ sufficiently considered several of the seven factors and properly assessed Plaintiff's credibility. The ALJ discussed Plaintiff's allegations in detail while recognizing her medically determinable impairments.  (Tr. 18-23).  The ALJ specifically noted that Plaintiff suffered no side effects from her medications (Tr. 19); that the alleged cardiac symptoms were frequently unsupported by objective tests (Tr. 20-23); that medical sources recommended regular exercise as a form of treatment, which Plaintiff did not follow (Tr. 21, 22-23); that Plaintiff's carpal tunnel could be treated by surgery but that Plaintiff declined such treatment (Tr. 21-22); and, objective tests failed to demonstrate any problems with ambulation or pain on inspection in the upper extremities.  (Tr. 21).  Finally, perhaps best described as falling into the category of "other factors," the ALJ specifically pointed out Plaintiff's positive Waddell's[6] signs as well as Plaintiff's poor effort during testing.  (Tr. 21).  While the decision admittedly could have

---

[6] "A positive Waddell's sign indicates that there exists a non-organic (*i.e.* psychological or psychosocial) component to an individual's lower back pain."  *Huckleberry v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 126716, 2012 WL 3886431 at note 1 (E.D. Mich. Aug. 6, 2012) (citations omitted); *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008) (Waddell's signs are a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms); *Mabra v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 118187, 2012 WL 3600127 at note 3 (S.D. Ohio Aug. 21, 2012) ("'Waddell's signs' refers to a system of identifying psychogenic or nonorganic manifestations of pain.") (citations omitted); *Hedden v. Comm'r of Soc. Sec.*, 2011 WL 7440949, at *12 (W.D. Mich. Sept. 6, 2011) ("In the context of a claim for compensation, nonorganic signs may (reasonably) raise the question of 'malingering'.  However, nonorganic signs are common in chronic pain patients in a clinical setting where there is no compensation.  Thus, the presence of nonorganic signs *per se* does not necessarily mean that a patient is lying or attempting to deceive the examiner....") (*quoting* Gordon Waddell, M.D., *Waddell's Signs—Do they Mean Malingering?*, Disability Medicine, March–June 2004 at 38).

19

contained a more specific credibility analysis, given the high deference owed to an ALJ's credibility findings and the ALJ's thorough discussion of the record, the ALJ's credibility finding is supported by substantial evidence.  Further, to the extent that Plaintiff contends the ALJ failed to assess her credibility in light of the relevant factors, the assignment of error is not well taken.

To the extent Plaintiff contends the ALJ should have identified each and every symptom Plaintiff alleged individually, should have discussed the alleged severity of each symptom individually, and should have made individual credibility determination regarding each alleged symptom, Plaintiff cites no authority for such a requirement.  The Court has found some authority to the contrary.  *See, e.g., Kohler v. Colvin*, 2015 U.S. Dist. LEXIS 77118 (S.D. Ohio Jun. 15, 2015) ("the ALJ was not required to accept as true every symptom she reported and provide a corresponding limitation in the residual functional capacity assessment to account for it"), adopted by 2015 U.S. Dist. LEXIS 89894 (S.D. Ohio, Jul. 10, 2015); *Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 807 (E.D. Mich. 2013) ("As long as the final decision incorporates all of the claimant's impairment – and here, the ALJ stated she did consider all of Dickey-Williams' 'subjective symptoms and complaints' – the fact an ALJ did not specifically state every piece of evidence or every symptom is not an error."); *accord Chandler v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 90128 at *31 (S.D. Ohio July 1, 2014) (in addressing the credibility of claimant's pain allegations, "the fact an ALJ did not specifically state every piece of evidence or every symptom is not an error"); *Lacaria v. Astrue*, 2009 U.S. Dist. LEXIS 81954 at 850 (N.D. W. Va. Jun. 30, 2009) ("Even though the ALJ did not list each symptom of which Plaintiff complained or each activity of daily living that Plaintiff stated or his physicians found he could perform, the record of evidence supports the ALJ's credibility finding as to Plaintiff.")

### 1. Obesity

Within her credibility assignment of error, Plaintiff also makes the argument that the ALJ failed to consider the effect of obesity on her ability to function.[7]  (Doc. 12 at pp. 14-16).  She asserts that the ALJ did not consider her obesity in accordance with Social Security Ruling ("SSR") 02-1p, 2002 SSR LEXIS 1, 2002 WL 34686281, when determining her RFC.

While it is true that SSR 02-1p advises adjudicators to consider a claimant's obesity during the disability evaluation process, the ruling does not require an ALJ to provide an exacting account of how the claimant's obesity impacted the ALJ's ruling at each step of the sequential analysis as Plaintiff implies.  The Sixth Circuit has observed that SSR 02-1p " does not mandate a particular mode of analysis.  It only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations.  It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants."  *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411-12 (6th Cir. 2006); *accord Shilo v. Comm'r of Soc. Sec.*, 600 Fed. App'x 956, 959 (6th Cir. 2015) (noting that while an ALJ must consider a claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation,"[t]he ALJ is not required to use any 'particular mode of analysis' in assessing the effect of obesity.")  Therefore, to the extent Plaintiff's brief suggests that the ALJ violated SSR 02-01p by failing to perform an analysis of Plaintiff's obesity in a particular manner, her argument lacks merit.

In the case herein, the ALJ specifically included obesity among Plaintiff's severe

---

[7] It is not entirely clear how this argument is related to credibility, as the ALJ included obesity among Plaintiff's severe impairments.

impairments, noting it had more than a minimal effect on Plaintiff's ability to work.  (Tr. 15).
Plaintiff has not identified any specific limitations related to her obesity that impacted her
functional abilities that were omitted from the RFC.  Moreover, she also fails to identify any
medical evidence or medical opinion of record suggesting that her obesity warranted greater
limitations than provided for by the RFC.  In *Essary v. Comm'r of Soc. Sec.*, the Sixth Circuit
Court of Appeals noted that "[t]he absence of further elaboration on the issue of obesity likely
stems from the fact that Essary failed to present evidence of any functional limitations resulting
specifically from her obesity."  114 Fed. App'x 662, 667 (6th Cir. 2004) (*citing Forte v. Barnhart*,
377 F.3d 892, 896 (8th Cir. 2004) (rejecting claimant's "argument that the ALJ erred in failing to
consider his obesity in assessing his RFC," explaining that, "Although his treating doctors noted
that [the claimant] was obese and should lose weight, none of them suggested his obesity
imposed any additional work-related limitations, and he did not testify that his obesity imposed
additional restrictions.")

Here, Plaintiff merely suggests that obesity may exacerbate her other impairments.  SSR
02-1p does state that "[t]he combined effects of obesity with other impairments may be greater
than might be expected without obesity," that obesity may enhance fatigue and thereby affect an
individual's physical and mental ability to sustain work activity, and that obesity may impact any
of the exertional functions such as sitting, standing, walking, lifting, *etc*.  However, Plaintiff's
assertion that her obesity was not considered is conjecture, given the lack of any evidence
suggesting greater restrictions were warranted.  The RFC finding arguably incorporates Plaintiff's
obesity by limiting her to less than a full range of light work; limiting her postural movements to
frequently or occasionally rather than constantly; and, requiring her to avoid hazards.  (Tr. 18.)

22

Finally, Plaintiff's argument concerning obesity was raised as a corollary to her credibility argument.  To the extent Plaintiff is arguing the ALJ *should* have found her allegations concerning the severity of her symptoms more credible *because* she is obese, this argument is wholly unsupported by SSR-02-1p.

Accordingly, Plaintiff has not demonstrated a remand is required by challenging the ALJ's consideration of her obesity.

## B.  RFC Determination

In her second assignment of error, Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence because it did not incorporate all of her work-related functional limitations.  (Doc. 12 at pp. 17-22).

Before moving to the fourth step in the sequential evaluation process, the ALJ must assess the claimant's RFC.  20 C.F.R. § 416.920(e).  The claimant's RFC signifies the claimant's remaining capacity to engage in work-related physical and mental activities despite functional limitations from the claimant's impairments.  20 C.F.R. § 416.945; *see also Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 530 (6th Cir. 1992).  "Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."  *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 578 (6th Cir. 2009)  Thus, it is ultimately the ALJ's responsibility to analyze the evidence of record and determine a claimant's RFC.  While the record may contain evidence supporting a more restrictive RFC assessment, the ALJ's ruling must be upheld where adequate evidence supports it.  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial

evidence would support the opposite conclusion.") (*citing Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)).

Specifically, Plaintiff asserts that RFC was deficient in the following ways: (1) she should have been limited to sedentary work based on notations from Dr. Lang and Dr. Christofferson; (2) the RFC failed to account for manipulative limitations stemming from her carpal tunnel syndrome; and, (3) the RFC did not account for moderate limitations with respect to her ability to concentrate or complete a normal workday or workweek without interruption from psychologically based symptoms. (Doc. 12 at pp. 17-22).

The ALJ is not required to incorporate into the RFC every symptom alleged by Plaintiff. *See, e.g., Harris v. Barnhart,* 171 Fed. App'x 211, 214 (9th Cir. 2006) ("The ALJ is not required to accept every symptom of which a claimant complains as rising to the level of a functional limitation."); *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007) (explaining that an ALJ's hypothetical only needs to include a claimant's impairments and "not each and every symptom of the claimant"); *cf. Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.")

Plaintiff asserts that she repeatedly stated she could not be on her feet for a long time and, therefore, the RFC, which provides for the ability to perform light work, is insufficient. (Doc. 12 at p. 19). To the extent Plaintiff is merely rehashing her above argument that her subjective complaints should have been found fully credible and, therefore, accounted for in the RFC, the Court has already rejected this line of argument and found the ALJ's credibility analysis sufficient. Plaintiff suggests that her alleged limitations with respect to standing are supported by

24

Dr. Langer and Dr. Christofferson, whom she refers to as treating physicians.[8]  (Doc. 12 at p. 19).

Dr. Christofferson, after a catherization, wrote a note that, among other instructions, advised

Plaintiff to "[a]void standing long time."  (Tr. 274, 747).  Though Plaintiff clearly believes the

ALJ should have interpreted this note as inconsistent with the functional ability to stand/walk for

six hours in an 8-hour workday as required by light work, the Court cannot agree given the

vagueness of the statement and lack of a precise limitation.

Further, assuming *arguendo* that the admonishment to avoid standing for a long time is

inconsistent with light work, there is no indication that the assessed limitation would last for

twelve months or longer.  The ALJ expressly rejected Dr. Christofferson's limitations, finding

that "[i]t appears the restrictions were suggested for a short time subsequent to a catherization

and these restrictions are not shown to be applicable for any period of time other than

immediately following that procedure."  (Tr. 20).  The Commissioner's brief states that the ALJ

"mistakenly believed these assessments were merely temporary discharge instructions," though it

---

[8]  The Commissioner disputes that Dr. Christofferson qualifies as a "treating source" under the
regulations and case law given that his treatment of Plaintiff amounts to administering
outpatient cardiac testing in April of 2012.  (Doc. 17 at p. 17).  Plaintiff's reply offers no
rebuttal to the Commissioner's assertion and she fails to point to a course of treatment that
would render Dr. Christofferson a treating physician.  (Doc. 19).  In *Daniels v. Comm'r of Soc.
Sec.*, 152 Fed. App'x 485, 489 (6th Cir. 2005), the Sixth found that a physician who only saw
the claimant twice was not a treating physician despite the ALJ referring to the physician as
such.  *Accord Hickman v. Colvin*, 2014 U.S. Dist. LEXIS 82914 (M.D. Tenn. June 18, 2014)
("Precedent in this Circuit suggests that a physician who treats an individual only twice or three
times does not constitute a treating source."); *Hakkarainen v. Astrue*, 2012 U.S. Dist. LEXIS
16431 (N.D. Ohio Jan. 19, 2012); *see also Taylor v. Astrue*, 245 Fed. Appx. 387, 391 (5th Cir.
2007) (two visits to doctor did not establish a treating relationship); *Beauchamp v. Comm'r of
Soc. Sec.*, 2014 U.S. Dist. LEXIS 37456 at *27 (N.D. Ohio Mar. 21, 2014) ("the treating
physician doctrine is based on the assumption that a medical professional has dealt with a
claimant and his condition over a long period of time will have a deeper insight into the
medical condition than a person who has examined a claimant but once.")

25

is unclear why the Commissioner believes this to be the case.  The record does contain a letter from Dr. Christofferson wherein he reiterated his recommendations, but that letter is dated December 19, 2013 and bears a facsimile transmission date of January 16, 2014 – both of which post-date the hearing decision of November 22, 2013.  (Tr. 274-75.)  As such, the Court finds nothing unreasonable about the ALJ's basis for rejecting the limitations assessed by Dr. Christofferson given the information in the record at that time.

With respect to Dr. Langer, the Commissioner accurately notes that while Dr. Langer generally agreed with the instructions of Dr. Christofferson, his treatment notes only mention the recommendations that Plaintiff increase fluid intake, increase sodium intake, and to be cautious when changing positions – Dr. Langer's treatment note make no mention of avoiding standing for long periods.  (Doc. 17 at p. 17, *citing* Tr. 724).  In fact, in the very same treatment note, Dr. Langer recommended that Plaintiff engage in a walking program.  (Tr. 724).  Approximately six months later, he advised Plaintiff engage in a daily aerobic exercise program.  (Tr. 718, 720).  The ALJ expressly referenced the exercise recommendation of Dr. Langer, noting that "it appears that her health professional was of the opinion that the claimant was capable of performing exercise."  (Tr. 21).  Therefore, to the extent Dr. Christofferson's advice against standing for a long time is construed as inherently inconsistent with light work, the ALJ sufficiently explained why he did not credit it.  *See, e.g.*, *Irby v. Colvin*, 2014 U.S. Dist. LEXIS 182553 at *11 (N.D. Ohio, Sept. 15, 2014) ("[T]he ALJ need not incorporate a medical opinion that was rejected.")

Plaintiff also contends that the RFC failed to account for her complaints regarding manipulative limitations.  (Doc. 12 at pp. 19-21).  Again, the Court has found the ALJ sufficiently explained why he found Plaintiff less than fully credible and her rejected self-

reported limitations need not be included in the RFC.  Plaintiff suggests that the diagnosis of carpal tunnel syndrome from Dr. Gonzalez, which was confirmed by positive Tinel's signs, required the ALJ to credit her alleged manipulative limitations, especially given that the ALJ ascribed "great weight" to Dr. Gonzalez's assessments.  (Doc. No. 12 at pp. 19-20, *citing* Tr. 22).  Notably, Plaintiff cites no law to support her argument.  Further, neither Plaintiff's brief nor her reply actually identify any manipulative restrictions assessed by Dr. Gonzalez stemming from her carpal tunnel syndrome.  (Docs. 12 & 19).  The treatment notes cited by Plaintiff do show that Dr. Gonzalez documented Plaintiff's self-reported right shoulder pain and self-reported weakness and numbness in the right hand (Tr. 731-34).  Further, his notes acknowledge that sometimes carpal tunnel can cause pain up into the shoulder area.  (Tr. 731).  Although Plaintiff reported pain in the right arm and shoulders on examination and exhibited "some limitation of the cervical and shoulder movement," Dr. Gonzalez's treatment notes cannot be construed as objectively confirming or denying either the validity or the severity of Plaintiff's pain allegations.  (Tr. 731-734).  Notably, Dr. Gonzalez's treatment  notes do not contain any restrictions concerning Plaintiff's use of her upper extremities and hands.[9]  (*Id.*)  As stated above, a diagnosis alone does not establish that a condition is disabling, nor does it establish the extent, if any, of the functional limitations caused by the condition.  *See, e.g., Young.*, 925 F.2d at 151 (diagnosis of impairment does not indicate severity of impairment).  Merely because the ALJ gave great weight to Dr. Gonzalez's diagnosis did not correspondingly require him to give great weight to Plaintiff's self-reported pain complaints contained in the treatment notes.  Several courts have held that "[w]hen

---

[9]  Dr. Gonzalez did advise Plaintiff to use hand splints at night.  (Tr. 731).  At a follow-up visit, Plaintiff stated the hand splints did not help.  (Tr. 732).

27

a treating physician's opinion is based on a claimant's self reports which are themselves not credible, it is not error to assign little weight to the opinion." *Webb v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 183418 at *18, 2014 WL 129237 at * 6 (E.D. Tenn. Jan. 14, 2014) (*citing Vorholt v. Comm'r of Soc. Sec.*, 409 Fed App'x 883, 889 (6th Cir. 2011)); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (affirming ALJ's rejection of treating physician opinions where "[t]hese doctors formed their opinions solely from Smith's reporting of her symptoms and her conditions and the ALJ found that Smith was not credible").  Here, Dr. Gonzalez gave no real indication whether he concurred with the alleged severity of Plaintiff's pain symptoms, nor did he assess any manipulative limitations.  Because an ALJ may reject a medical source's opinion based solely on a claimant's self-reports, it necessarily follows that an ALJ need not credit a claimant's self-reported allegations merely because they are documented within a treatment note.  Therefore, the ALJ did not err by failing to incorporate Plaintiff's self-reported manipulative limitations in the RFC.

Finally, Plaintiff notes that State Agency consultant Dr. Goldsmith opined that she was moderately limited in her ability to maintain attention and concentration for extended periods, as well as moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Doc. 12 at p. 21, *citing* Tr. 76-77).  She also notes that another State Agency consultant, Dr. Swain, agreed with these limitations.  (Tr. 92).  Plaintiff's brief, however, does not meaningfully explain how these limitations are allegedly inconsistent with the limitations the ALJ incorporated into the RFC, which included only simple, routine work with infrequent changes, a prohibition against strict/fast production quotas, and

only superficial interaction with others.

Plaintiff's brief does suggest that moderate limitations in these areas are somehow inconsistent with the mental demands of all work and cites POMS § DI 25020.10, which states, in relevant part, that the mental abilities needed for any job requires the ability to: (1) "maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure):" (2) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and (3) "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of  rest periods."  U.S. Social Security Administration § DI 25020.010.[10] (Doc. 12 at p. 22).

As pointed out by the Commissioner, Plaintiff makes the unsubstantiated assumption that "moderate" limitations in these areas are the equivalent of a *complete inability* to perform these mental demands.  If Plaintiff's argument were credited, all claimants who are found to have moderate limitations in these areas would *automatically be disabled* due to their inability to perform the mental requirements of *all* work.  Absent any citation to any case law, regulation, or ruling that supports such an expansive interpretation of POMS, the Court rejects Plaintiff's

---

[10]  The Program Operations Manual System ("POMS") is the operational reference used by Social Security Administration staff to conduct its daily business.  "While these administrative interpretations [POMS] are not products of formal rulemaking, they nevertheless warrant respect ..."  *Washington Dep't of Soc. Servs. v. Keffeler*, 537 U.S. 371, 385, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). The POMS is available at http://www.ssa.gov/regulations/index.htm.

position and finds her third assignment of error to be without merit.[11]

**C.  Sentence Six Remand**

Plaintiff also argues that a sentence six remand is appropriate, as she was found disabled after she filed a new application subsequent to the Appeals Council's decision affirming her denial.  (Doc. 12 at pp. 22-23).

The Sixth Circuit Court of Appeals has held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *accord Cox v. Comm'r of Soc. Sec.*, 615 Fed. App'x 254, 261 (6th Cir. 2015) ("After the ALJ rendered her decision, Appellant submitted additional evidence from Dr. Tucker to the Appeals Council, including additional treatment notes and an opinion regarding Appellant's limitations.  A court cannot consider such a belated submission when reviewing an ALJ's decision.")  Nonetheless, pursuant to 42 U.S.C. § 405(g), a court "may . . . remand [a] case to the Commissioner . . .  for further action by the Commissioner . . . and it may at any time order additional evidence to be taken before the Commissioner . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record

---

[11]  In the second last sentence of her second assignment or error, Plaintiff, in addition the concentration limitations discussed, mentions the ALJ's alleged failure to include limitations with respect to her diminished cognitive abilities.  (Doc. 12 at p. 22).  While the facts section of the brief does recount some low IQ scores, Plaintiff fails to advance a developed argument with respect to her intellectual abilities and her RFC. As a result, the Court will not address an undeveloped "argument" mentioned in passing. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

in a prior proceeding." It is the party seeking remand under § 405(g) that bears the burden of demonstrating showing that remand is appropriate. *See, e.g., Sizemore v. Sec. of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). Evidence is considered new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (internal quotation marks omitted). "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711. In addition, "'Good cause' can be shown only by demonstrating a reasonable justification for failing to present the evidence at the administrative hearing." *Kepke v. Comm'r of Soc. Sec.*, 2016 U.S. App. LEXIS 601 (6th Cir. Jan. 12, 2016) (*citing Foster*, 279 F.3d at 357)).

Here, Plaintiff has failed to meet her burden of demonstrating that a sentence six remand is warranted. She has not identified any new evidence that was plainly not in existence at the time of the hearing, but only that a subsequent application resulted in a favorable decision. She also fails to offer any good cause for failing to present the unidentified evidence at her administrative hearing. Plaintiff cites no law or regulation suggesting that a subsequent favorable decision, in and of itself, warrants a sentence six remand of an earlier unfavorable decision on appeal in federal court. Plaintiff's reply brief contends that only the Commissioner has possession of the evidence used in the subsequent decision. (Doc. 19 at p. 4). This statement cannot be credited, as it is Plaintiff's burden to produce evidence demonstrating that she is entitled to disability, nor can she plausibly argue that the Commissioner has access to her medical

records while she herself does not.[12]

Therefore, a sentence six remand is not warranted.

### VII.  Conclusion

For the foregoing reasons, the court finds that the decision of the Commissioner is

supported by substantial evidence.  Accordingly, the decision is AFFIRMED.

IT IS SO ORDERED.

/s/ Kenneth S. McHargh
U.S. Magistrate Judge

Date: August 3, 2016

---

[12]  The Commissioner contends that Plaintiff's subsequent application was granted solely on the grounds that Plaintiff's age category changed from "closely approaching advanced age" to "advanced age."  (Doc. 17 at p. 24).